Good morning. My name is Ed Spinney. I represent Defendant Lee Armstrong. I'm also a council table attorney for Sherry Armstrong, Kendra Matthews, and Harrison Lotto is here representing Daniel Davenport. They have agreed that I can use any or all of the 20 minutes that will be available to answer any specific questions the court might have about their specific cases. The issue in this case is whether the arson that occurred in Reed's Court, Oregon in 1994 was a state case should have been prosecuted in state court or was had sufficient facts to allow it to be tried in federal court. There are two separate jurisdictional issues that relate to this case that both have to do with jurisdiction, but have different analyses, which unfortunately becomes somewhat confused. In some of the cases and some of the briefs, and even my own brief in reviewing it for oral argument, they discovered that they had some carryovers from one analysis to the other. Let's talk about an issue that's troubling me with regard to a waiver, and that is there was a prior direct appeal in this case after the Supreme Court decided United States v. Lopez. To the extent that the defendants are challenging the jurisdiction under the federal arson statute with regard to the effect on interstate commerce, why didn't they have a full opportunity to raise the Lopez as applied challenge on their direct appeal? Why aren't they barred now on 2255 review from raising the same argument that they could have raised before but didn't? Because the subsequent cases in 2001 of Jones v. United States and U.S. v. Morrison changed the landscape of jurisdictional law in arson cases. But doesn't that go as much to a facial challenge? I'm asking specifically, Lopez clearly raised the bar with regard to the reach of Congress under the Commerce Clause in federalizing arson for profit. And here, of course, you challenged, as I understand the prior appeal, the ability of the government to bring this case in federal court because there was insufficient evidence of an impact on interstate commerce. And I'm not sure that you can continue to raise that issue if you had an opportunity to litigate it once and didn't raise the argument. Didn't raise the Lopez argument? You've already raised it. I mean, why should we hear it again is essentially what I'm asking. Well, because we're contending that subsequent cases have changed the law further, that Morrison and Jones have changed the Lopez law. The law that was established in Lopez even further in significant respects, that defendants at that time, in 1997, I believe, when this case was submitted on direct appeal, those cases had not yet been decided and the defendants did not have the benefits of the analysis that were created by those cases. Isn't the issue still on whether or not the building was used sufficiently for a commercial purpose to have a nexus to interstate commerce? That is part of the argument, yes. That's under Jones. But that would have been the argument under Lopez. That's what I'm having. I mean, I hear what you're saying with regard to what Jones did in contracting the reach. But the argument is the same, that the evidence was simply insufficient as a matter of commerce clause jurisdiction or power of Congress to federalize an arson of this business because it didn't have sufficient nexus to interstate commerce. It was the argument. The argument was made. But it's the same argument under Jones. I may not be articulating my concern very well, Mr. Spinney, but isn't it the same argument? I mean, the facts haven't changed any. The question is whether or not your legal theory would be different under Jones versus Lopez. And it seems to me it's the same theory, that the evidence is insufficient to show a nexus between the use of the building and interstate commerce. Well, the basic argument is the same. But Jones created new aspects of that argument with regard to what it takes to satisfy the requirement that the connection. And they've created the requirement that it has to be shown that the use in interstate commerce was active rather than just passing the past, which was a significant part, I think, of the Jones case. But that was the issue at trial. That was the issue that our prior panel on direct review addressed, finding under Lopez, post-Lopez, that there was sufficient evidence. I mean, it's the same inquiry. But the issue on direct appeal was not whether that – whatever use there was of that building was passing the past. That was not raised and not discussed, and that's the new issue that Jones creates. Which gets back to my original question, which was, in light of Lopez, you certainly had noticed that that was the issue. You could have raised it on direct appeal. Now you say you didn't. The question I have for you is, having in essence waived that argument, why should we entertain it on federal habeas review if it's basically the same argument? The issue under Lopez was merely, was there a substantial effect on interstate commerce? And isn't that the same question you're urging upon us today, that the evidence was not sufficient to establish that effect? Now the argument has changed based on Jones because Lopez did not talk about the timeliness of the effect on interstate commerce. Before on direct appeal, we were talking about all of the things that had happened from the time the parties rented this building in January of 1994, through the fire on August 31st, 1994. And all of those things were joined together in an argument as to whether there was a substantial effect on interstate commerce. I don't see how that's different. I mean, I guess now you're arguing temporal that there wasn't enough evidence just before the fire to show that this was still being actively used. But it's still, the argument is still the same, that there was insufficient evidence of an effect on interstate commerce. I just don't understand what's different about your theory. Well, coming down to that basic part of it, it is not different, at least under the Jones analysis. Maybe on the assumption, let's leave that question hanging. On the assumption that we have jurisdiction to address the question, you want to talk about the merits. The second issue aside from that arrest that's addressed in the Jones case, that's whether the sufficient sufficient evidence to satisfy that statutory court, which is in the statute, is whether Morrison, there was jurisdiction under the Commerce Clause. And that's a different analysis separate from the jurisdictional hook. That part of the statute is just put in there by Congress to try to bring into the ambit of the Commerce Clause actions, which it thinks is appropriate for the arson statute. But separate from that is whether there's jurisdiction under the Commerce Clause. Now, focus these cases, the focus of the analysis and determining whether the statutory hook has been met is on the function of the building. That's what's described in Jones under Morrison. The focus is on the activity rather than on the building. It's the activity of arson, which is what is being regulated by the arson statute. And the question then is whether the activity being regulated is as a substantial relation to interstate commerce or is attenuated and not regular. Able to be regulated by Congress. The key issue. In that case is whether the activity is economic or non-economic. And that affects whether the court can consider the activity itself. Just the arson of this building isolated by itself. Does that have a substantial effect on interstate commerce? Whether whether it can take all similar type of activities and aggregate those and consider that aggregate effect on interstate commerce and regulated, regulated under that. The. Cases seem or at least without contradiction, the ones that do consider the issue say that arson is a non-economic activity. And. Papadopoulos, I think, is the case that it was the Ninth Circuit that said arson is a non-economic activity. The other cases have dealt with the same manner. The result of that is that for this arson to have fallen under the Commerce Clause or the power of Congress under the Commerce Clause. It has to stand alone. It can't rely upon other similar types of arsons as a reason to regulate that. Well, the question, as I understand it, under the statute is whether the building is used in interstate or foreign commerce or in an activity affecting interstate or foreign commerce. So the question is not whether the arson does or whether the building is being used in such a fashion. Isn't that right? I don't think it is because I just read you the statute. It says whoever maliciously damaged or destroys any building used in interstate foreign commerce or an activity affecting interstate foreign commerce. So the question is whether the building is being used in interstate commerce. That's the issue under the statute. Yes. And I'm talking about the issue separate and distinct issue under the Constitution and the Commerce Clause, which does not have the word used in it in the cases that interpret that don't use that. Are you arguing I may be putting words in your mouth, so I want to make sure that I've got your argument right. Are you arguing that the statute is broader than the Constitution permits? Broader than? Are you arguing that the statute includes behavior that the Constitution does not permit the government, the federal government to prohibit? Yes. I'd always read this statute as narrower than the constitutional provisions. I thought that was the premise of the case law. Well, I think it was Lopez, perhaps Russell, I don't remember which of the earlier cases, initially said that Congress intended to exercise its full powers under the Commerce Clause by adding that language. That was later retracted by the Supreme Court where they said that it has to extend to the full length of the Commerce or full extent of the Commerce Clause to be able to regulate these things. So let's go let's go to the actual use being made of the building at the time it's burned down. It had been used to run this business. The business was tapering off. The business had not entirely dried up at the time of the fire. I wouldn't say it's accurate to say it's tapering off. There are indications in the record by both sides that the business was actually defunct at the time of the fire. The last actual business activity that had taken place was three and a half months before May. Mid-May of 1994, they delivered a scale model to someone in Texas from mid-May until August 31st. There was no construction of any scale model business. Were they making telephone calls or were they making some bill? Are they attempting to solicit business during this this period after that last model was delivered? There was some evidence that there was still some solicitation going on, but the evidence was pretty sparse. There was evidence that there were over 300 telephone calls made in a significant period of time, but without any direct evidence of which of the 300 phone calls were made to solicit business which were private. I thought the defense testimony was that on the day of the fire they had traveled to Portland to solicit business from an architectural firm. When they left the building just before the fire and they were on their way to Portland, one of their objectives in Portland was to have discussions with an architect. So doesn't that cut against your theory that there was no evidence or that the business was defunct if they're still soliciting business from architects? Well, in a sense it does. Don't we have to view the inference from that fact in the light most favorable to the government in light of the fact that we're reviewing a conviction on habeas? Well, yes, and you can't view that as there were telephone calls going on, there were discussions with other companies, but under the analysis of Jones focuses on the building, not on the business. We're not using the building for the purpose of contacting someone when they drove up to Portland. Well, they left the building that day to go to Portland. I mean, I don't know what else you can do with the building when you're making a sales call. Had they received an eviction notice? Yes. Did it have a time frame on it? They were well past the time. They were out of time on their eviction notice? Yes. They had initially been granted an extension by the landlord for a couple of weeks, and they were even past that extension period of time. So they were in the process of moving out. So you're claiming that the building wasn't being used in interstate commerce at the time of the fire? That's right. They had made a decision that they were moving from there. One of the cases makes the statement that for the arson to affect interstate commerce, there has to have been commerce going on, and the arson has to have terminated. I believe that's the Ballinger case. Did I also read that there was an attempt a couple of weeks before the fire to obtain business interruption insurance? Yes. Now, under the government's theory of the case, the parties had been planning for quite some time to commit this arson, and there's an inference that that business interruption insurance. If that's true, that would certainly be consistent with the profit motive to burn the business down, to collect insurance proceeds, right? The evidence was actually both ways on that. In the government's brief, it asserts that Sherry Armstrong made a statement that she was not interested in getting business interruption insurance at that time because the business was defunct. Why would you solicit a quote for business interruption insurance if you think your business is defunct? Well, there were three people involved in this thing. I think Mr. Davenport was the one who was out seeking business interruption insurance, and Mrs. Armstrong was the one saying that they didn't need it. So I just have three minutes left. I'd like to resume that. You'd like to save the time? Yes. My name is Frank Papagni. I was the prosecutor back in 1995, I guess it was, when we started this case. The first argument I make has already been made by Judge Tolan. I don't make arguments. I just make rulings. Well, I ask questions. The question, then, I will put in that language, Your Honor, is that we've dealt with this before. Lopez was decided in 1995. This case was first argued before this court in 1997. Before Judge Hogan, I believe it was Mr. Graffetti who represented Ms. Armstrong, made the motion that the evidence was insufficient as a matter of law to establish that the building of Reed's Court had any substantial effect or that the activity there had any substantial effect on interstate commerce. I cited that on page four of my brief, and it refers to the trial transcript, pages 3,831. So the issue was presented. It was taken up on appeal. This court dealt with it and reviewed much of the same evidence that I presented to you folks in my supplement section. How far does your argument on this point go? Do you say that anything adversely decided at the trial court in a criminal trial and on appeal is beyond the reach of habeas? I'm sorry, I hear that. Are you saying that anything adversely decided to the defendant at trial, which decision is then affirmed on direct review, is beyond the reach of habeas? No, I'm not saying that at all. I'm saying that this court has to look at the non-retroactivity principles put before this court in evaluating whether or not this issue has been fairly resolved. I see. So it's not a race-judicata question. It's a Teague v. Lane question. Correct. I see. Okay. With that in mind, then, it gets to the next question, I guess, and that is if we get beyond the question of the procedural bar, does this court look at the aspects that are being argued today? Now, Teague v. Lane isn't really so much a procedural bar. It's a question of retroactivity. Is this a rule that's being applied retroactively? Teague v. says you cannot apply or announce a new rule. Teague v. Lane, that's correct. So this is a Teague question, then, if I understand your argument. It is a Teague question that is one of the bars that I've presented. I've tried to raise both of them. When you say both, what's the other one? The prior resolution doctrine, the red case that Judge Goodman sat upon years ago. Okay. So I've tried to raise both those. Help me understand the prior resolution argument a little more, then, because I think I understand the Teague v. Lane issue, but I'm not sure I understand the prior resolution issue. If the same issue has been presented to this Court previously and decided upon, then it is not re-raised again in an habeas proceeding. That's the very shorthand version. I believe I brought the copy of the case with me today. Yes. And Judge Goodman was on that particular panel. It goes back a few years. But that's the way I've read that particular doctrine. What's your side on that case? I've made the arguments on page 30 through 31 of my brief, and if I can go to the front of my brief. I'm not finding it right now, Your Honor. Okay. 30 and 31 of the red brief. That's where I make the procedural arguments, the prior resolution. I believe I also – You say you brought the case with you? I've re-read it. If you just want to read me the site. Okay. Apologize for the delay. 759 Fed 2nd, 699. 759 Fed 2nd. 699. 699. Let me see if that is in your brief. Yes, it's on page 701, the way I read it. It says, Reid raised this precise claim on his direct appeal, and this court expressly rejected it. Therefore, this claim cannot be the basis of a 2255 motion, citing Eger, E-G-G-E-R versus United States, 509 Fed 2nd, 745, page 748, Ninth Circuit, cert denied, 1975. Okay. Got it. Thank you. I apologize for the delay. No, no, not your fault. You're doing fine. Thank you. So I've tried to raise both those bars, but the more interesting question, of course, is the usage of this particular building, and in particular, what evidence. There's two arguments that seem to be made by Mr. Spooning, my colleague and adversary in this particular issue, and that is I think he's trying, at least in his reply brief, to attack the constitutionality of this particular statute. And the question, not the argument submitted by Judge Fletcher, was whether the statute, in fact, is more narrowly defined than the constitution that the government submits it is. I think that the statute does specifically contain a jurisdictional element that fits within the Constitution's Commerce Clause. What has happened since the Lopez decision and this Court's last visitation of this case has obviously been the evolution of the interstate commerce provision by our Supreme Court and the subsequent cases that have come down since then. The living Constitution. That's what I was taught back in high school. This Court is interesting. I found it when I was doing my homework that Judge Fletcher, who's got to be on the panel in the United States v. Lamont, 330 Fed 3rd 1249, which got to deal with an issue regarding interstate commerce, and I believe that was the setting of a church fire. And the church's use, as I recall it, was found not to be of a commercial nature, and therefore the Commerce Clause in this particular statute could not apply. I believe Judge Tolman also, interestingly enough, in the United States v. Adams, at 343 Fed 3rd, page 1024, also sent an opportunity to look at this particular statute and made a ruling on child pornography that was commercial in nature as opposed to interstate, which was an earlier decision of this Court, I believe, in McCoy. The bottom line that I seem to gather from reading this Court's decisions that if we do review this question again today as to whether or not this particular building fit within the statute, whether we look at Lopez in the prior rulings or we look at the Lopez progeny and this Court's decision since then, we first look to the question of the building itself and its nature. That is why in my supplementary excerpt of record I provided you with photographs, the location of the building and its use. It was next to a restaurant, a parking lot, an alleyway, and a post office. If you look at the building, it does not look like a home in the suburbs of Kansas City or some other location in this country, which would indicate that it was used primarily for homeowner use. The building itself, as I've given you in my excerpt of record, plus in my argument, was registered as the business address for Echo Enterprises, which was the miniature architectural firm. The building itself was not meant to be a home. It was not meant to be a church. It was meant to be used for commercial purposes. An underlying or a second level of my argument would be this. Russell has not been overruled, and this building was leased. Therefore, it was rented, and therefore, under Russell, it's part of a commercial activity in interstate commerce, if Russell still has validity, which we assume it does. But the top argument that I make is that even if you don't look at the lease, which was a commercial lease, according to Mr. DiBala, the owner of the building, the fact that the defense decided to live there, he did not object to on the upper floor. It was used for commercial purposes. And we know that not only because of the interstate phone calls that were made and the business that were made, but we know that because on the day of the fire, Mrs. Armstrong was nice enough to have made a phone call to the FBI to say that they were going to Portland. They were going to Portland for business purposes. They were going to meet with an architect. Mr. Lee Armstrong had made several phone calls to the same business in mid-August. Now, interesting question. On the one hand, you could say, Mr. Pagny, you're arguing this business was going under. It was defunct, and that's why they burned it, so they get the insurance money. That's what I argue. On the other hand, my argument is they still thought it was a business. It wasn't a very good business. They still were making interstate commerce phone calls. In fact, Mrs. Armstrong was kind enough to send a letter to the U.S. Attorney's Office, not knowing about the cameras that were on the poles outside her building because they were complaining they were victims of anti-Semitic action. When she wrote us a letter, she explained to us what this business was about and what had happened to her. Page 16 of my appellate brief. On March 2, 1995, we received a letter. Actually, the U.S. Attorney did. I didn't receive it. It said an hour and a half after we left our building that morning, there was a fire that destroyed everything in our apartments and wiped out my business. We had heard it was arson. Then she went on to go ahead and represent that a week before the fire that she had signed a $25,000 contract for a model and would have to fly back east within one week notice to get the details on the model, and that she lost this contract and another one worth $5,200 because of the fire. I go on to provide you with a description of the type of testimony offered, saying that there were numerous interstate contacts in Seattle. Let me ask you this. Assuming that it's a lie that she didn't have this contract. I probably think it was, but there were exhibits offered. Let me ask you this. Assuming that it is a lie that she didn't have this contract, can you use the business she pretended falsely to have to support your interstate commerce argument? We could probably ignore the blockbuster video, that she thought she was going to do miniature contracts or miniature models for with Mr. Lee Armstrong and Mr. Davenport, and focus in on the fact that on the day of the fire there was a- I'm asking you a different question. You're sliding off just a little bit. I'm sorry. Is there some sort of an estoppel on the commerce argument, or are we supposed to talk about facts on the estoppel argument? Really, what was the business? That was my question about if she's lying that she had the business, is she stuck with a lie, or do we look at the facts of what the business actually was? I think it's important to- at least I think I've been taught it's important to look to the truth of the matter. The truth of the matter is I saw it as we've been to the jury. Your facts may be enough. You may not need the estoppel. I think they are. On the day of the fire, they're going to Portland. They actually meet with an architect, and believe it or not, they actually get a contract. They go ahead and make the model the following months while their insurance claims process through. As far as Mr. Spinney's request is, was this building still being used for business on the day of the fire? Yes, it was registered with the Secretary of State as being the business address for Echo Enterprises. Yes, on the day of the fire, they were in Portland talking to an architect, or at least that day or the next day. I'm not quite sure which day. Yes, it resulted in a contract. Yes, that building was the building they represented where the architectural miniature was going to be built to the architect, who did testify at the trial. Without assuming that Ms. Armstrong was lying or telling us the truth, the reality was, on the day of the fire, this building was commercial in nature and was being used in commerce. That evidence was introduced at the trial. The jury heard all that, right? Pardon? The jury heard all that, including the letter she wrote to the U.S. Attorney. Yes. I guess from our standpoint as appellate judges, we have to presume that in deciding whether or not the activities of the building affected interstate commerce, as the district court presumably instructed the jury to do, that this evidence could have been relied upon by a reasonable fact finder in concluding that that element was met by Profiona reasonably. Not only is your statement accurate, but if you look at this court's original opinion, there was a challenge to the jury instruction given on interstate commerce, and yes, the jury was instructed on that matter. There were other issues. Judge Hogan is pretty thorough in that regard. Are there any other issues regarding the ineffective assistance of counsel I can address with him, but we are late in the day, and I realize that there were some other arguments made. Well, I had one question about the so-called Alford plea. Yes. Was there ever any plea bargain negotiation or a plea was offered? I made a plea offer in writing. I extended it twice. The offer was to plead guilty. Yeah, I understand that. But was there a term of a recommended sentence incorporated in the, not in the writing, but in the negotiations for the plea? What I put in my plea letter, Judge Goodwin, is what the offer was, no more, no less, and it was absolutely a guilty plea. There were no negotiations on this case beyond what my plea offer was. So there wasn't any advantage offered. What I'm getting at is was there any detriment suffered by the defendant because her lawyer didn't proceed further with the plea? The answer to your question would be, as I put in my, it's in my excerpt of record, my second extension for them to take my plea offer was either you take this or you reject it. If you don't take it, then we're going to go back to the grand jury and do a superseding indictment, which is precisely what we did. Thank you. Thank you for your, and you save a little time. I wanted to go back to the Teague issue, and I'm not sure whether I misunderstood part of counsel's argument, but under Teague there was a case, I believe it was the 11th Circuit, Ryan, U.S. v. Ryan, which is cited in the briefs, which is in the same posture that this case is in. It was a 2255 that was brought before the court, having already made arguments regarding jurisdiction and direct appeal, and the court determined that there were new rules of law that could be applied retroactively, as determined by Jones in that case. And my understanding, and maybe part of the reason I'm surprised by the questions in that, is that the government, in its brief at page 32, conceded that Jones and Morrison established new rules, and their argument seemed to be that those rules were substantive. Yeah, but how did those rules help you? How did they help me? Yeah. Well, because under Jones, our contention is that on August 31st, any connection with interstate commerce was passed, and under Morrison, that the activity the defendants were engaged in was non-economic activity, and therefore aggregation was not appropriate in that case. Well, that was a fact question, wasn't it? They included in what went to the jury was whether they were engaged in business and interstate commerce. Under Jones, yes, whether the building was used in interstate commerce was submitted to the jury with instructions that we disagreed with, one of which relates to this being a lease. And the instructions said that you can determine that there is interstate commerce just by virtue of the fact that this is a lease with nothing more. But you're not contending that we can revisit the propriety of the prior panel's ruling on the jury instructions on habeas, are you? No. I'm just commenting on that. And regarding your question regarding the plea agreement, I'm not confident what's in the record, but I think that the record is clear that there was a detriment suffered by the defendant. Your question, I think, was the offer. Well, what was the detriment? In order to prevail on an ineffective assistance claim, you've got to show that there was some kind of a strickland violation and that it was prejudicial. What was the prejudice to this defendant by not understanding more fully all of the implications of going to trial versus? Prejudice is that we were all serving sentences in excess of 10 years now and had they accepted the plea offer, they would have gone two years or something. Well, that was what I was trying to get at from the other side was what was the difference. So you say it's about eight years. Yes, that's my recollection of what the record reflects. Yes, I'm done. Okay. Thank you very much. Thank both of you for a helpful argument. The case of the United States versus Armstrong is now submitted for decision. We're adjourned for the day and we will reconvene tomorrow morning. Unfortunately, without Judge Goodwin. I shall miss you. The court for this session stands adjourned. Thank you. Thank you.
judges: Goodwin, W. Fletcher, Tallman